IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

OMJ PHARMACEUTICALS, INC.,

    Plaintiff,

    v.

UNITED STATES OF AMERICA,

    Defendant.

Civil No. 11-1312 (GAG)

**OPINION AND ORDER**

    Nothing is certain except death and taxes.  This case tests this theory in a most complicated fashion, at least as it pertains to taxes.  OMJ Pharmaceuticals Inc., ("OMJ") brings suit against the United States of America ("USA") seeking a refund of federal income taxes and related interest for the taxable years ending on November 30, 1999 and November 30, 2000.  (See Docket No. 1 at 1.) OMJ brings suit pursuant to the Internal Revenue Code of 1986, as amended and codified in Title 26 of the U.S. Code.  (See id.)  The court has jurisdiction pursuant to 26 U.S.C. § 7422 and 28 U.S.C. §§ 1340, 1346(a)(1).

    Currently before the court are the parties' cross-motions for summary judgment.  (Docket Nos. 41 & 42.)  OMJ's motion (Docket No. 41) was opposed by USA (Docket No. 43).  OMJ filed a reply (Docket No. 49).  USA's motion (Docket No. 42) was opposed by OMJ (Docket No. 46). USA filed a reply (Docket No. 50).  After reviewing the submissions and pertinent law, the court **GRANTS** USA's motion for summary judgment at Docket No. 42 and **DENIES** OMJ's motion for summary judgment at Docket No. 41.

**I.    Standard of Review**

    Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

**Civil No. 11-1312 (GAG)**                                           2

of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 51 (1st Cir. 2010) (citing Adria Int'l Group, Inc. v. Ferré Dev. Inc., 241 F.3d 103, 107 (1st Cir. 2001)) (internal quotation marks omitted). Although

**Civil No. 11-1312 (GAG)**                                3

each motion for summary judgment must be decided on its own merits, each motion need not be considered in a vacuum. Wells Real Estate Inv. Trust II, Inc., 615 F.3d at 51 (quoting P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 133 (1st Cir. 2010)) (internal quotation marks omitted). "Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time, applying the same standards to each motion." Wells Real Estate Inv. Trust II, Inc., 615 F.3d at 51 (quoting P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 133 (1st Cir. 2010)) (internal quotation marks omitted).

## II.    Relevant Factual Background

### A.    OMJ's Corporate History as a Section 936 Entity

Johnson & Johnson is a U.S. corporation that is the parent company of various subsidiaries that develop, manufacture, and distribute healthcare products in the consumer, pharmaceutical, and medical devices and diagnostics markets. (See Docket Nos. 41 ¶ 1; 43-1 ¶ 1.) OMJ is a Johnson & Johnson subsidiary that manufactures and sells these healthcare products in over 100 countries. (See id.) For decades, U.S. corporations operating in Puerto Rico have received preferential tax treatment as an incentive to locate and operate their businesses in Puerto Rico. (See Docket Nos. 41 ¶ 3; 43-1 ¶ 3.) In 1976, a modification to this structure was enacted as part of Section 936 of the Internal Revenue Code ("Section 936"). (See Docket Nos. 41 ¶ 4; 43-1 ¶ 4.) Section 936 allowed a qualifying U.S. corporation to claim a credit for income attributable to its active operations in a U.S. possession, i.e., Puerto Rico. (See Docket Nos. 41 ¶ 5; 43-1 ¶ 5.) This credit could be applied to reduce federal income tax owed by the corporation. (See id.)

Since 1976, subsidiaries of Johnson & Johnson have been engaged in manufacturing operations in Puerto Rico, and Johnson & Johnson has claimed credits pursuant to Section 936. (See Docket Nos. 41 ¶ 6; 43-1 ¶ 6.) Johnson & Johnson was conducting manufacturing operations through twelve or more subsidiaries, but in 1993, many of these subsidiaries were consolidated into OMJ. (See Docket Nos. 41 ¶¶ 7-8; 43-1 ¶¶ 7-8.) OMJ is incorporated in Delaware and its principal place of business is Puerto Rico. (See Docket Nos. 41 ¶¶ 10-11; 43-1 ¶¶ 10-11.) For the taxable

**Civil No. 11-1312 (GAG)**                               4

years of 1993 through 2000, OMJ elected to be treated as a possessions corporation under Section 936. (See Docket Nos. 41 ¶ 14; 43-1 ¶ 14.) Between 1993 and 1998, OMJ reported and claimed Section 936 credits for its manufacturing operations based in Puerto Rico. (See Docket Nos. 41 ¶ 15; 43-1 ¶ 15.) OMJ conducted the manufacturing operations of Janssen Products ("Janssen"), Ortho Biologics ("Ortho"), Lifescan, Iolab, Orthos Pharmaceuticals ("Lifescan"), and McNeil Pharmaceutical business division ("McNeil"). (See id.)

In 1996, Congress repealed the tax incentives contained in Section 936, but allowed corporations a ten-year transition period to continue to claim the credits before the repeal took full effect. (See Docket Nos. 41 ¶ 16; 43-1 ¶ 16.) During the transition period, the maximum credits allowed pursuant to Section 936 were capped at the claimant's "adjusted base period income." (See Docket Nos. 41 ¶¶ 17-18; 43-1 ¶¶ 17-18.) It is undisputed that OMJ remained eligible to claim Section 936 credits throughout the ten-year transition period. (See Docket Nos. 41 ¶ 19; 43-1 ¶ 19.)

**B.     OMJ Transfers on November 30, 1998**

OMJ transferred a portion of its assets in Janssen, Ortho, and Lifescan to OMJ Ireland Ltd. ("OMJ Ireland"). (See Docket Nos. 41 ¶¶ 21-22; 43-1 ¶¶ 21-22.) OMJ Ireland is a wholly owned subsidiary of OMJ. (See Docket Nos. 42-2 ¶ 6; 46-1 ¶ 6.) This transfer occurred on November 30, 1998 and became effective at midnight on December 1, 1998 (the "1998 Transfers"). (See id.) These transfers took place in two steps. First, OMJ made three transfers. OMJ transferred a portion of its assets in Janssen to Janssen Ortho, LLC in exchange for a 100% membership interest in Janssen Ortho, LLC. (See Docket Nos. 41 ¶ 23(A); 43-1 ¶ 23(A).) Janssen Ortho, LLC became a separate and distinct entity from OMJ for federal tax purposes. (See id.) OMJ transferred a portion of its assets in Ortho to Ortho Biologies, LLC in exchange for a 100% membership interest in Ortho Biologies, LLC. (See Docket Nos. 41 ¶ 23(B); 43-1 ¶ 23(B).) Ortho Biologies, LLC became a separate and distinct entity from OMJ for federal tax purposes. (See id.) OMJ transferred a portion of its assets in Lifescan to Lifescan, LLC in exchange for 100% of the Class A and Class B membership interests in Lifescan, LLC. (See Docket Nos. 41 ¶ 23(C); 43-1 ¶ 23(C).) Lifescan, LLC

**Civil No. 11-1312 (GAG)**                                          5

became a separate and distinct entity from OMJ for federal tax purposes. (See id.) Janssen Ortho, LLC, Ortho Biologics, LLC and Lifescan, LLC (collectively "the LLCs") were all formed in September 1998 and had no assets or liabilities prior to the stated acquisitions. (See Docket Nos. 42-2 ¶¶ 2-3; 46-1 ¶¶ 2-3.)

The second part of this transfer also occurred on November 30, 1998, when OMJ transferred its interests in Janssen Ortho, LLC, Ortho Biologies, LLC, and Lifescan, LLC to OMJ Ireland in exchange for 2000 shares of common stock in OMJ Ireland. (See Docket Nos. 41 ¶ 24; 43-1 ¶ 24.) The transfers were considered asset transfers from OMJ to OMJ Ireland. (See Docket Nos. 41 ¶ 25; 43-1 ¶ 25.) The parties disagree as to whether any assets retained by OMJ are material for purposes of summary judgment, but the parties do agree that OMJ did not transfer all of its assets to OMJ Ireland through these transfers. (See Docket Nos. 41 ¶ 26; 43-1 ¶ 26.) After these transfers, OMJ continued to manufacture products in Puerto Rico. (See Docket Nos. 41 ¶ 27; 43-1 ¶ 27.) OMJ continued to report and claim Section 936 credits on its U.S. federal income tax returns throughout the ten-year transition period. (See Docket Nos. 41 ¶ 28; 43-1 ¶ 28.) The parties agree these transfers represent a transfer of the major portion of each particular business. (See Docket Nos. 42-2 ¶ 7; 46-1 ¶ 7.)

Janssen Ortho, LLC, acquired a plant in Gurabo, Puerto Rico, that produced pharmaceutical products. (See Docket Nos. 42-2 ¶ 10; 46-1 ¶ 11.) Janssen Ortho, LLC manufactured seven products, four of which were under contract with OMJ. (See Docket Nos. 42-2 ¶ 12; 46-1 ¶ 13.) Ortho Biologics, LLC acquired a plant located in Manati, Puerto Rico, along with machinery and equipment associated with the plan. (See Docket Nos. 42-2 ¶ 8; 46-1 ¶ 8.) The parties disagree whether Ortho Biologics, LLC acquired certain liabilities from OMJ, such as accounts payable and accrued salary and wages of employees that worked at the plant. (See Docket Nos. 42-2 ¶ 10; 46-1 ¶ 10.) Lifescan, LLC acquired a plant in Cabo Rojo, Puerto Rico that produced test strips used for testing glucose levels. (See Docket Nos. 42-2 ¶ 14; 46-1 ¶ 15.)

There is considerable disagreement between the parties regarding which entity employed the workers at these plants, which entity was responsible for paying these employees and whether the

**Civil No. 11-1312 (GAG)**                                      6

LLCs were ever an employer prior to December 31, 1998. (See Docket Nos. 42-2 ¶¶ 15-16; 46-1 ¶¶ 16-17.) However, it is uncontested that OMJ charged the LLCs for the wages it paid the workers at the plants and for the amounts it paid for federal employment taxes. (See Docket Nos. 42-2 ¶ 17; 46-1 ¶ 18.) The LLCs filed federal employment tax returns for periods beginning in the first quarter of 1999. (See Docket Nos. 42-2 ¶ 18; 46-1 ¶ 19.) The LLCs used the shared services group of OMJ to provide payroll and human resource support. (See id.)

### C. OMJ Ireland

OMJ Ireland was incorporated in Ireland in 1998 as a subsidiary of OMJ and has always been a foreign corporation. (See Docket Nos. 41 ¶ 32; 43-1 ¶ 32.) During the relevant time period, the taxable years ending on November 30, 1998, 1999, and 2000, OMJ Ireland was ineligible to claim Section 936 credits and did not become eligible to do so due to the 1998 Transfers. (See Docket Nos. 41 ¶¶ 33-34; 43-1 ¶¶ 33-34.) Whether OMJ Ireland qualified as an existing credit claimant of Section 936 credits is disputed. (See Docket Nos. 41 ¶ 35; 43-1 ¶ 35.) Prior to 1998 and during the relevant years, OMJ Ireland was not subject to the U.S. internal revenue tax contained in Chapter 1 of subtitle A of the Internal Revenue Code. (See Docket Nos. 41 ¶¶ 36-37; 43-1 ¶¶ 36-37.)

### D. Consequences of the 1998 Transfers

At this juncture the parties begin to dispute the ramifications of the 1998 Transfers. It is contested whether OMJ Ireland was subject to any internal revenue tax immediately after the 1998 Transfers. (See Docket Nos. 41 ¶ 38; 43-1 ¶ 38.) It is contested whether the employees were transferred from OMJ prior to January 1, 1999. (See Docket Nos. 41 ¶¶ 39-40; 43-1 ¶¶ 39-40.) OMJ asserts OMJ Ireland first became responsible for paying the U.S. internal revenue tax on January 7, 1999, while USA claims taxes were owed beginning on December 1, 1998. (See Docket Nos. 41 ¶ 42; 43-1 ¶ 39.) For the taxable years ending on November 30, 1998, 1999 and 2000, OMJ Ireland was not required to, and in fact did not, file any U.S. federal income tax returns. (See Docket Nos. 41 ¶ 43; 43-1 ¶ 43.)

### E. Taxable Year Ending in November 30, 1999

The parties agree that OMJ was eligible to claim Section 936 credits for the taxable year

**Civil No. 11-1312 (GAG)**                                     7

ending on November 30, 1999. (See Docket Nos. 41 ¶ 44; 43-1 ¶ 44.) For the three years preceding the November 30, 1999 taxable year, OMJ derived at least 75% of its gross income from active trade or business within Puerto Rico and 80% of its gross income from sources within Puerto Rico. (See Docket Nos. 41 ¶ 44(B & C); 43-1 ¶ 44(B & C).) For the first ten months of 1995, when annualized and without regard to any extraordinary items, OMJ had an inflation adjusted possession income of $726,590,114. (See Docket Nos. 41 ¶ 45; 43-1 ¶ 45.) If no decreases due to the 1998 Transfers were required, this figure would represent OMJ's adjusted base period income. (See Docket Nos. 41 ¶ 45; 43-1 ¶ 45.)

OMJ earned $662,819,287 of taxable income for the 1999 taxable year, with $631,273,838 qualifying as taxable income for purposes of Section 936. (See Docket Nos. 41 ¶ 46; 43-1 ¶ 46.) OMJ claims this amount should not decrease due to the 1998 Transfers. If the 1998 Transfers do not require a decrease, OMJ would be entitled to $88,378,337 in Section 936 credits. (See Docket Nos. 41 ¶ 47; 43-1 ¶ 47.) If, as USA claims, OMJ was required to decrease their base period income due to the 1998 Transfers, then OMJ would be entitled to on $58,710,540 in Section 936 credits. (See id.) In late October 2004, OMJ filed an amended U.S. corporation income tax return claiming a refund of $27,537,675 for the taxable year ending on November 30, 1999. (See Docket Nos. 41 ¶ 48; 43-1 ¶ 48.) This was later revised in 2011 to claim a refund of $22,874,764. (See Docket Nos. 41 ¶ 49; 43-1 ¶ 49.) The Internal Revenue Service ("IRS") denied the amended income tax return, claiming OMJ was not entitled to this refund due to the 1998 Transfers. (See Docket Nos. 41 ¶ 51; 43-1 ¶ 51.)

**F.     Taxable Year ending on November 30, 2000**

The facts pertaining to the taxable year ending in 2000 are similar to those of 1999, with only the monetary figures changing. In this year, the parties agree OMJ was eligible to claim Section 936 credits. (See Docket Nos. 41 ¶ 52; 43-1 ¶ 52.) For the three years preceding the November 30, 2000 taxable year, OMJ derived at least 75% of its gross income from active trade or business within Puerto Rico and 80% of its gross income from sources within Puerto Rico. (See Docket Nos. 41 ¶ 52(B & C); 43-1 ¶ 52(B & C).) For the first ten months of 1995, when annualized and without

**Civil No. 11-1312 (GAG)**                                           8

regard to any extraordinary items, OMJ had an inflation adjusted possession income of $726,590,114. (See Docket Nos. 41 ¶ 53; 43-1 ¶ 53.) If no decreases due to the 1998 Transfers were required, this figure would represent OMJ's adjusted base period income. (See Docket Nos. 41 ¶ 45; 43-1 ¶ 45.)

OMJ earned $747,040,140 of taxable income for the 2000 taxable year, with $700,587,457 qualifying as taxable income for purposes of Section 936. (See Docket Nos. 41 ¶ 46; 43-1 ¶ 46.) If the 1998 Transfers do not require a decrease, OMJ would be entitled to $98,082,244 in Section 936 credits. (See Docket Nos. 41 ¶ 47; 43-1 ¶ 47.) If, as USA claims, OMJ was required to decrease their base period income due to the 1998 Transfers, then OMJ would be entitled to on $58,710,540 in Section 936 credits. (See id.) At the same time OMJ filed an amended tax return for the 1999 taxable year, OMJ also filed an amended tax return for the 2000 taxable year. (See Docket Nos. 41 ¶ 56; 43-1 ¶ 56.) OMJ sought a refund of $37,928,839, which was later amended in March 2011 to be $30,094,104. (See Docket Nos. 41 ¶¶ 56-57; 43-1 ¶¶ 56-57.) The IRS denied OMJ's revised refund claim and mailed notice of that decision on March 28, 2011. (See Docket Nos. 41 ¶ 59; 43-1 ¶ 59.)

  **G.** **Procedural History**

OMJ filed its original complaint on April 1, 2011, which was later amended on December 19, 2011. (See Docket Nos. 41 ¶ 60; 43-1 ¶ 60.) The amended complaint contains two counts, one for each year, 1999 and 2000, in which the IRS denied OMJ's refund. The first count pertaining to the 1999 taxable year seeks a refund of $22,874,764 and the second count for the taxable year of 2000 seeks a refund of $30,094,104. (See Docket Nos. 41 ¶ 61; 43-1 ¶ 61.) The taxes at issue in this case have been fully paid by OMJ and OMJ only seeks a refund of these amounts. (See Docket Nos. 41 ¶ 62; 43-1 ¶ 62.)

**III.** **Legal Analysis**

Before analyzing the merits of the case, the court notes the First Circuit has previously dealt with the statute involved in the present dispute, albeit not in this exact context. See MedChem (P.R.), Inc. v. C.I.R., 295 F.3d 118, 122-23 (1st Cir. 2002). MedChem is instructive in two

**Civil No. 11-1312 (GAG)**                              9

preliminary matters. First, the MedChem court quoted the Supreme Court as stating, "'It is well established in the tax law that an [IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes] is entitled to a legal presumption of correctness -a presumption that can help the Government prove its case against a taxpayer in court.'" See MedChem, 295 F.3d at 123 (quoting United States v. Fior D'Italia, Inc., 536 U.S. 238 (2002)) (alteration in original). The court notes that while an IRS decision does not require the court's blind allegiance, the IRS determination that OMJ was not entitled to a refund of the payments at issue in this case is given a presumption of correctness. (See Docket No. 41-1 at 7.) The second preliminary matter for which the MedChem decision is instructive is that the First Circuit held "income tax deductions and credits are matters of legislative grace; the taxpayer bears the burden of proving entitlement to any deduction or credit claimed." See MedChem, 295 F.3d at 123 (citing INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992)). OMJ attempts to distinguish the present case from this precedent. (See Docket No. 46 at 7.) Again, while this precedent does not control the outcome of the present case, the court does consider the spirit of the holding in making its determination.

Turning to the merits, the critical issue in this case is the applicability of the various provisions of Section 936. Section 936 allows corporations that elect the application of this statute to receive "a credit against the tax imposed by this chapter" in an amount determined by a formula also contained in the statute. 26 U.S.C. § 936(a)(1). In 1996, due to amendment Congress phased out this credit over a ten year period. See MedChem, 295 F.3d at 119; 26 U.S.C. § 936(j). Section 936(j)(5)(D) requires a corporation to increase or decrease the amount of the tax credit when a corporation either acquires or disposes of major portions of businesses. See 26 U.S.C. § 936(j)(5)(D) ("Acquisitions and dispositions. – Rules similar to the rules of subparagraphs (A) and (B) of section 41(f)(3) shall apply for purposes of this subsection."). This section effectively adopts the provisions contained in 26 U.S.C. § 41(f)(3), which is a similar research credit statute. That section states:

> (3) Adjustments for certain acquisitions, etc. –Under regulations prescribed by the Secretary–
>
> (A) Acquisitions. –If, after December 31, 1983, a taxpayer acquires the major portion of a trade or business of another person (hereinafter in this

**Civil No. 11-1312 (GAG)**                                  10

> paragraph referred to as the "predecessor") or the major portion of a separate unit of a trade or business of a predecessor, then, for purposes of applying this section for any taxable year ending after such acquisition, the amount of qualified research expenses paid or incurred by the taxpayer during periods before such acquisition shall be increased by so much of such expenses paid or incurred by the predecessor with respect to the acquired trade or business as is attributable to the portion of such trade or business or separate unit acquired by the taxpayer, and the gross receipts of the taxpayer for such periods shall be increased by so much of the gross receipts of such predecessor with respect to the acquired trade or business as is attributable to such portion.
>
> (B) Dispositions. –if, after December 31, 1983–
>
> (i) a taxpayer disposes of the major portion of any trade or business or the major portion of a separate unit of a trade or business in a transaction to which subparagraph (A) applies, and
>
> (ii) the taxpayer furnished the acquiring person such information as is necessary for the application of subparagraph (A),
>
> then, for purposes of applying this section for any taxable year ending after such disposition, the amount of qualified research expenses paid or incurred by the taxpayer during periods before such disposition shall be decreased by so much of such expenses as is attributable to the portion of such trade or business or separate unit disposed of by the taxpayer, and the gross receipts of the taxpayer for such periods shall be decreased by so much of the gross receipts as is attributable to such portion.

26 U.S.C. § 41(f)(3). The applicability of these provisions to OMJ ultimately answers the question posed to the court.

USA first argues Section 936 requires OMJ to reduce the cap on its credit because it disposed of a major portion of its businesses -namely, the LLCs. (See Docket No. 42-1 at 10.) The cap is calculated based on a corporation's adjusted base period income for a qualifying period.[1] On the other hand, OMJ argues the statute does not require a reduction because the statute only requires a corporation to decrease its cap when there is a corresponding increase in the acquiring corporation's cap. (See Docket No. 46 at 13.) OMJ points to Section 936(j)(5)(D) to support this correlative argument. (See Docket No. 46 at 13.) For the reasons discussed below, the court does not find the

---

[1] The parties do not dispute the calculation of the base period income, only whether the disposition of the LLCs required a reduction of the cap.

**Civil No. 11-1312 (GAG)**                                11

statute necessitates such a correlative relationship.

A close examination of the statute and repercussions of any interpretations of such is required under these circumstances. OMJ points to language contained in Section 41(f)(3)(B)(i), which states that for a disposition of a business asset to require a cap reduction, it must occur "in a transaction to which subparagraph (A) applies, and . . . ." 26 U.S.C. § 41(f)(3)(B)(i). OMJ argues that because OMJ Ireland is not a taxpayer and subparagraph (A) requires a taxpayer to acquire the business, the provision does not apply to the dispositions of the LLCs. (See Docket No. 46 at 12-13.) This argument is composed of two separate parts: (1) whether the statute applies when the acquiring party is not a taxpayer; and (2) whether the statute requires a correlative increase in the acquiring party's credit when the disposing party's credit decreases.

**A.     Whether the Statute Requires the Acquisition to be Made by a Taxpayer**

OMJ argues that it is not required to reduce its Section 936 credit because OMJ Ireland is not a taxpayer. OMJ reaches this conclusion because subparagraph (B)(i) states a reduction is only required when subparagraph (A) applies, and subparagraph (A) applies when "a taxpayer acquires . . . ." Therefore, because OMJ Ireland, as the acquiring corporation, is not a taxpayer, the statute does not apply. However it is clear from the statutory language of subparagraph (B) that a taxpayer could dispose of a major portion of a business to a non-taxpayer and still be required to reduce its qualifying credit. Subparagraph (B)(ii), also dealing with dispositions, states, "the taxpayer furnished the acquiring person such information as is necessary for the application of subparagraph (A)." 26 U.S.C. § 41(f)(3)(B)(ii). The use of the terms 'taxpayer' and 'acquiring person' within the same sentence demonstrates Congress intended this provision to apply to all dispositions of a major portion of a business, including transactions between a taxpayer and a non-taxpayer. The term 'person' encompasses a broader audience than the term 'taxpayer.' If Congress intended for the cap reduction provision contained in subparagraph (B) to apply only to transactions between taxpayers, then Congress could have used the term 'acquiring taxpayer' rather than 'acquiring person.'

This analysis is in harmony with subparagraph (A), which also discusses transactions between a taxpayer and an acquiring person. There is no requirement in subparagraph (A) that a

**Civil No. 11-1312 (GAG)**                                12

taxpayer acquire the major portion of a business from another taxpayer; rather, a taxpayer could acquire such a business from a foreign corporation and still increase its cap. As both subparagraph (A) and (B) refer to taxpayers either acquiring or disposing of businesses with 'persons' as opposed to 'taxpayers,' the court finds it is not necessary that the transaction occur between two taxpayers.

This conclusion leads to a sensible interpretation of the statute. If the court adopts OMJ's interpretation, a corporation could dispose of the major portions of its businesses within a U.S. possession to a foreign corporation and remain entitled to a tax credit for those businesses. Reading the statute as a whole, it is clear Congress intended for corporations to receive a credit for income earned within a possession of the U.S. When the credit began to be phased out, the amount of the credit was set to fluctuate, increasing when the corporation acquired additional qualifying businesses and decreasing when the corporation disposed of qualifying businesses. See 26 U.S.C. § 936. The fact that OMJ Ireland is not a taxpayer will not allow OMJ to evade a reduction of its Section 936 credit.

**B.    Whether the Statute Requires Correlative Adjustments Under Subparagraphs (A) and (B)**

Next, OMJ argues the statute does not apply to its transactions because the statute necessitates a correlative relationship between the acquisition of a business and the disposition of a business. Essentially, OMJ's argument is that no reduction of Section 936 credit can occur unless there is a correlative increase in the acquiring party's Section 936 credit. (See Docket No. 46 at 12-13.) USA disagrees and asserts the is no statutory support for this assertion and that this assertion is contrary to other subsections of Section 936. (See Docket No. 50 at 7.)

OMJ's argument rests on the inclusion of the phrase "in a transaction to which subparagraph (A) applies . . . ." 26 U.S.C. § 41(f)(3)(B)(i). Subparagraph (A) explains how an acquiring party may increase its cap. OMJ argues that by including this language, dispositions can only lead to a reduction in the cap when the acquiring party may claim an increase in its cap. (See Docket No. 46 at 13.) This would mean, in circumstances such as this, when the acquiring party is a foreign corporation, the disposing party has no obligation to reduce its cap. Admittedly, the court finds it

**Civil No. 11-1312 (GAG)**                13

difficult to reconcile the inclusion of this phrase within the context of the statute. On the one hand, this language infers that any decrease in cap should correspond with an offsetting increase for the acquiring party. On the other hand, the statute strictly prohibits corporations from using the tax credit against organic growth from within the corporation, a result that would occur if OMJ's interpretation is applied. See generally, 26 U.S.C. § 936. To resolve this conflict, the court turns to accepted rules of statutory interpretation.

Courts should interpret statutory provisions in harmony with one anther, if possible. See YULE KIM, CONG. RESEARCH SERV., 97-589, STATUTORY INTERPRETATION: GENERAL PRINCIPLES AND RECENT TRENDS 6 (2008) ("A cardinal rule of construction is that a statute should be read as a harmonious whole, with its various parts being interpreted within their broader statutory context in a manner that furthers statutory purposes."). On occasion, provisions within a statute may be ambiguous, or its meaning unclear when analyzed in isolation. See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme -because the same terminology is used elsewhere in a context that makes its meaning clear . . . or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (internal citations omitted). Section 936 is a comprehensive statute, enacted to provide an incentive for U.S. corporations to locate their research and development plants in U.S. possessions. When this incentive was phased out, Congress made clear it intended to limit the use of this credit to existing credit claimants only. Both Sections 936(j)(5)(D) and 936(j)(9)(B) strictly limited the use of this credit for corporations having disposed of a major portion of a business or corporations that created new lines of business. When Congress decided to phase out the tax credit, it specifically decided to cap the amount of qualifying income to income previously earned during the base period. See 26 U.S.C. § 936 (j)(5). In so doing, Congress made the decision that organic growth of corporations located in qualifying territories would not be shielded from income taxes. The phase out period was instituted as a means to notify those corporations currently located in a U.S. possession and enjoying the credit to decide whether

**Civil No. 11-1312 (GAG)**               14

they wanted to slowly shift their operations elsewhere. At the same time, this statute did not allow additional future earned income on top of the base amount to qualify for these credits. Supporting this cap is Section 936(j)(9)(B), which contains a clause prohibiting an existing credit claimant from adding a new line of business and still retaining its Section 936 credits. 26 U.S.C. § 936(j)(9)(B).[2] To allow OMJ to continue to benefit from this credit would manifestly undercut various other provision within the statute. As such, the court finds the statute does not require a corresponding increase in the acquiring corporation's cap in order to require the disposing corporation to decrease its cap.

As previously discussed, the court has found it unnecessary for the acquiring party to be a taxpayer. The court has also found it unnecessary for there to be a correlative increase in the acquiring party's cap in order for there to be a decrease in the disposing party's cap. Therefore, the court need not further analyze the parties' remaining arguments.

**IV.   Conclusion**

For the foregoing reasons, the court **GRANTS** USA's motion for summary judgment at Docket No. 42 and **DENIES** OMJ's motion for summary judgment at Docket No. 41.

**SO ORDERED**

In San Juan, Puerto Rico this 18th day of October, 2012.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge

---

[2] Section 936(j)(9)(B) states, "If, after October 13, 1995, a corporation which would (but for this subparagraph) be an existing credit claimant adds a substantial new line of business (other than in an acquisition described in subparagraph (A)(ii)), such corporation shall cease to be treated as an existing credit claimant as of the close of the taxable year ending before the date of such addition." 26 U.S.C. § 936(j)(9)(B).